**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**



**UNITED STATES OF AMERICA,**

**VERSUS**                    **CASE NO. 1:21-CR-00073-HSO-JCG**

**NICHOLAS PAUL GODSEY**

**REPLY TO GOVERNMENT'S RESPONSE**
**IN OPPOSITION TO DEFENDANT'S MOTION**
**TO VACATE UNDER 28 U.S.C. § 2255**

I, Nicholas Godsey, petitioner herein and defendant in the underlying criminal case,

proceeding *pro se*, herewith reply to the Government's *Response in Opposition to Defendant's*

*Motion to Vacate Under 28 U.S.C.§ 2255* (ECF 76), filed April 4, 2024.

1.    ***My § 2255 Motion:***    I have raised three issues in my *§ 2255 Motion*.  Although

Attorney J. Tyler Cox seemed confused in his *Response of Jarrett Tyler Cox to Defendant's*

*Claim of Ineffective Assistance of Counsel* (ECF 72), I have not alleged that Attorney Cox

rendered ineffective assistance of counsel with respect to any matter.[1] Rather, I only alleged that

the attorney my mother hired for me on July 19, 2021–Attorney J.D. Taylor–rendered

incompetent advice that prejudiced me in material ways.

2.    I have alleged that Attorney J.D. Taylor rendered ineffective assistance prior to

entry of the guilty plea by advising me to proffer to the Government without telling me that the

complaint alleging an 18 U.S.C. § 922(g)(1) violation had been superseded by a multi-count

---

[1]    However, I do question the accuracy and good faith of his representations about
the status of plea negotiations and my uncooperativeness. *See infra* at pp. 2, 8.

indictment alleging a drug distribution conspiracy, possession with intent, a § 922(g)(1) count and a counterfeiting allegation. I have alleged that Attorney J.D.'s incompetence extended into the change-of-plea proceeding, because he never explained that I was pleading to an § 846 drug trafficking conspiracy and—when that became apparent part way through the proceeding—he misadvised me that because I was "careered out," pleading to the drug conspiracy would not matter to my sentence. Finally, I allege that Attorney J.D.'s incompetence continued up to and during sentencing, due to his failure to investigate evidence that most of the methamphetamine that was assigned to me was not mine and that government claims that I met with a supplier in Mexico and often traveled to the border were baseless.

3.    ***Response:***    Attorney Cox, as noted, filed a declaration denying that he had provided ineffective assistance of counsel, a position with which I agree. However, he averred that when he met me on August 4, 2024 (I am sure he means 2021), "[i]t was and still is the undersigned's understanding that Mr. Taylor spoke to Mr. Godsey prior to my arrival and knew the purpose of my visit. During said visit, Mr. Godsey knew he had been indicted... Mr. Godsey asked questions relating to ongoing plea negotiations and the undersigned advised him to speak to Mr. Taylor." *Id.* at p.3.

4.    Despite my having questioned Mr. Cox's good faith in telling the court on two occasions that extensions of time were needed because of settlement and then telling the Court that he was withdrawing because I was uncooperative, Mr. Cox says nothing about either matter in his *Declaration.*

5.    Attorney J.D. Taylor also submitted an *Affidavit* (ECF 73). Much of the document is self-serving platitude, *i.e.,* "Mr. Godsey and his mother were aware of both Taylor Law Firm and myself would be assisting on the case. In fact, this was first to the delight of the Godsey

family as it meant a team of attorneys would be putting eyes on the case, with myself navigating

the most crucial part of the proceedings" (*Id.* at p. 1); "in my extensive time as a criminal defense

attorney comma this is again the first time for me to be requested an affidavit in any manner

comma and my diligence used for every single client does not vary no matter the situation

period." *Id.* at p.2).  Some of it is simply gibberish: "Moreover, the assistance I am referring to

and take caution in same, which show the acknowledgment of his intent to plea as such

assistance would be superfluous for trial purposes." *Id.*[2] Nevertheless, Attorney J.D. does

specifically aver that "[t]he computation of the weight of the substance was objected to yet

overruled by his Honor. The video mentioned and substance contained within was also applied in

the most conservative manner by the Government by interpreting language in a light most

favorable to Godsey. Mr. Godsey was advised fully, kept complete autonomy, and chose not to

challenge this after considering the standard that would need to be met by Government in its

determination" *Id.* at pp. 2-3.

      6.     Attorney J.D. Taylor also averred that the video in question originated "from the

phone which was seized." Most important in the Affidavit is the following :

> The complaint states that the video contains a person and only shows the arms of
> the individual in question, as well as some audio. This was asserted close to the
> conclusion of the case and the name was given to the Government for further
> investigation. An individual not named at any point earlier in the process and the
> assertion he was the one in the video and wanted to take the blame for the content,
> did not materialize in any way nor did the individual need myself to make such an
> admission. Again, I was contacted by the Godsey family on so many different
> occasions, usually outside the prescribed hours of the workday, it is not possible
> to address same without context. Mr. Godsey did not assert that a Mr. Dalton was
> responsible for the video at anytime in his representation, unless the message was
> sent from a cell phone contained within the jail. The person who sent a text about
> Mr. Dalton did not come from Godsey, but instead someone within his family and

---

    [2]     *See also id.* at p.1: "this is the first time I have been requested to file this affidavit,
and if my response lacks needed depth I would be happy to do so, in the interest of justice."

friends. It strikes me as odd that if this were so, Mr. Godsey would have failed to say so with multiple opportunities on the record.

*Id.* at p. 4.

7.     Attorney J.D. Taylor does not address whether he ever provided me with a copy of the indictment, whether he had ever appeared as counsel in a federal criminal matter prior to mine, whether he told me prior to my DEA debriefing that I had been charged with drug trafficking offenses in addition to the § 922(g) offense of which I was aware, or whether he told me during the brief meeting prior to the change-of-plea proceeding when I signed the plea agreement that I was pleading to a drug conspiracy. He did not deny that when he told me during that meeting that the Government had a video of me holding drugs, I told him that that could not be possible.  He did not deny that he never allowed me to see the video. He did not deny that he advised me during the change-of-plea hearing that I should just agree with the plea to a drug charge of which I was unaware, because I was "careered out," so it would make no difference. Likewise, he did not deny that he told me before sentencing that the drug quantity found in the Court would not affect my sentence because I was a career offender.[3]

8.     The Government argued that I made specific admissions at the change-of-plea proceeding which undercut my claim of ineffective assistance at the change-of-plea, maintaining that "[t]he record clearly establishes that Taylor reviewed both the indictment and the plea agreement with Godsey." *Government Response, supra* at p.10.

9.     The Government contends that Attorney J.D. Taylor did not become my lawyer until January 12, 2022, so nothing that may have happened the summer before when Attorney

---

[3]     For that matter, Attorney J.D. Taylor does not explain why–while my mother hired him (and he only had Attorneys Cox and Calvin Taylor present to cover for him when he had a scheduling conflict)–he made no appearance in this case for six months after he was hired, although he did appear for the DEA debriefing.

Taylor represented me at the DEA proffer could relate to him. The Government contends, "[t]herefore, Godsey also had the benefit of prior counsel, and Godsey had ample time to learn what was contained in his indictment." *Id.* at p.11. What's more, the Government says, nothing it learned at the proffer was used against me. *Id.*

10.     The Government represents that it met with Attorney J.D. Taylor on January 31, 2022, and found him to be "particularly effective." The Government asserts without support even from Attorney J.D. Taylor's affidavit that "Counsel Josh D Taylor reviewed the indictment (Dkt. No. 66, at 7), the plea agreement and supplements (*id.* at 9) and the PSR (Dkt. No. 68 at 3) with Godsey.  Dkt. No. 73, at 2." *Government Response, supra* at p.12.

11.     The Government represents that I have not asserted that but for Attorney J.D. Taylor's advice, I would have proceeded to trial. *Id.*  After all, the government claims that it "possessed video evidence that Godsey was trafficking drugs from Mexico to the United States and was prepared to prove his case beyond a reasonable doubt if Godsey opted for a trial." *Id.*

12.     Finally, the Government defends Attorney J.D. Taylor's decision not to investigate whether the person on the Government's video was me, noting that in his affidavit, Attorney J.D. Taylor "indicates that the possibility that the individual depicted in the video might be someone other than Godsey, apparently came from a Godsey family member, and not from Godsey personally." *Id.* at p.14.  The Government argues that "[i]n this case, it was not unreasonable to not investigate an individual whose name was first brought up near the end of Godsey's case, and who apparently was not mentioned by Godsey personally during the course of Taylor's representation." *Id.* at p.15.

13.     Ultimately, the Government opined that "Godsey received substantial benefit from his plea negotiations with the government, facilitated by his defense counsel, and Godsey

has failed to demonstrate either deficient performance or prejudice on the part of his attorney."
*Id.* at p.16.

14.     Nowhere does the government challenge my complaint that Attorney J.D. Taylor misadvised me that due to my career offender status, the quantity of drugs attributed to me would not matter.

### *Argument*

15.     As an initial matter, the Government's argument relies substantially on the affidavits of Attorneys Cox and J.D. Taylor, as well as the Government's own vouching for the "particularly effective assistance of counsel" that Attorney J.D. Taylor allegedly provided me during a meeting with the Government and probation officer. *Id.* at p.11.  At this point, the Court may not resolve contested fact issues in a § 2255 case on the basis of affidavits. *Friedman v. United States*, 588 F.2d 1010, 1015 (5th Cir. 1979), citing *Montgomery v. United States*, 5 Cir., 1972, 469 F.2d 148 (5th Cir. 1972) and *Brown v. United States*, 462 F.2d 681 (5th Cir. 1972). Thus, where the facts asserted in the attorneys' declarations or unsworn testimonials by the Government clash with my declarations or the declarations of others I provide, the denial of my petition without a full hearing cannot be justified on the ground that the factual predicates asserted in support of the petition were conclusively negated by declarations proffered by the Government.

### Ground 1:   Defense counsel rendered ineffective assistance prior to entry of the guilty plea

16.     I raise as my first ground the complaint that without me being notified in advance, Attorney J.D. arranged for me to speak to DEA agents without telling me that I had been indicted on multiple counts.  When Attorney Cox appeared to obtain my waiver of indictment, he did not tell me that the arraignment was for a multi-count indictment that charged me not just with a

felon-in-possession charge, but with drug charges as well. When I signed the waiver of

arraignment, I thought that I was merely waiving my right to appear and enter a not-guilty plea.

17.     Attorney Cox (against whom I raise no ineffective-assistance claim) avers only

that "[i]t was and still is the undersigned understanding that Mr. Taylor spoke to Mr. Godsey

prior to my arrival and knew the purpose of my visit. During said visit, Mr. Godsey knew he had

been indicted." Attorney Cox does not state that he told me as much. In fact, he did not, nor did

Attorney J.D. Taylor speak to me prior to Attorney Cox's visit to tell me that I had been indicted

on four counts.

18.     The Government claims that nothing I told the DEA was used against me,

consistent with the Government's promise to me, but as I aver my *Motion,* the information I

provided to the DEA was used to assess three ounces of methamphetamine against me at

sentencing. If I had known that I was under indictment for drug offenses, I would not have

spoken to the DEA. But because I believed I was charged merely with an 18 U.S.C. § 922(g)(1)

offense and that the DEA was seeking my help in investigating drug crimes, I was willing to

speak to the agents.

19.     The Government argues that Attorney J.D. could not have rendered ineffective

assistance during the proffer, because "Josh D Taylor did not become Godsey's counsel until on

or about January 12, 2022. *Id.* at p. 11. Nothing supports this claim. Attorney Cox states that

"after the filing of said compliant *[sic],* the undersigned was contacted by attorney J.D. Taylor to

assist in his representation of Mr. Godsey. On July 21, 2021, the undersigned entered his

appearance in the above captioned cause." *Response of J. Tyler Cox* (ECF 72) at p.1. My

mother, Stephanie Godsey, states in her declaration (attached as **Exhibit R1)** that she hired

Attorney J.D. Taylor on July 21, 2021, and she provides a copy of a Client Information Sheet he

gave her. My sister, Natalie Godsey, paid half of Attorney J.D. Taylor's initial fee on July 20,

2021, and now provides a copy of the receipt her CashApp account generated for that payment (attached as **Exhibit R2**). Attorney Cox says that in August 2021, when I asked him questions relating to any ongoing plea negotiations, he "advised [me] to speak to Mr. Taylor." *Id.* at p.3. Contrary to the Government's claim, Attorney J.D. Taylor was the one pulling the strings on the representation even at that early date.

20.    Something was clearly going on, and it was not that Attorney J.D. Taylor just had scheduling conflicts. Although he did not enter an appearance until January 2022, he appeared at the DEA proffer with me. Attorney Cox says that he was simply intended to "assist [Attorney J.D. Taylor] on this case on and as needed basis; meaning, if Mr. Taylor had a scheduling conflict the undersigned would attend any hearings in his stead" (*Response* (ECF 72) at p.2). This does not explain why Attorney J.D. Taylor did not enter his appearance along with Attorneys Cox and Calvin Taylor, nor does it explain the repeated representations of Attorneys Cox and Calvin Taylor in fall 2021 that more time was needed because of settlement talks I had not even heard of. Most significantly, it does not explain the scurrilous claims made by Attorneys Cox and Calvin Taylor in their motions to withdraw–which they later passed off as mistakes–that they wanted out because I was uncooperative and seeking new counsel. I believe that if I were an attorney accused of making an "outrageous falsehood[]" to the Court (as I stated in my *Motion*), I would want to correct any impression that I had lied to the Court in my responsive statement. Attorney Cox does not mention it whatsoever.

21.    I note that neither Attorney J.D. Taylor nor the Government contradicts my assertion that Attorney J.D. was a babe in the federal criminal woods, with no prior experience in the type of case I faced or the procedures applicable to federal cases. Likewise, they do not dispute my claim that the months and months Attorneys Cox and Calvin Taylor spent misleading

the Court that they were studying the plea offer with me was really done solely to enable them to

rid their law firm of Attorney J.D. Taylor.

<strong>Ground 2:      Defense counsel rendered ineffective assistance<br>in advising and representing me regarding entry<br>of the guilty plea</strong>

22.     I complained that Attorney J.D. Taylor never advised, during the one 15-20

minute meeting held in the jail a few days before the change-of-plea hearing that I was pleading

guilty to a drug conspiracy and not to an 18 U.S.C. § 922(g)(1) felon-in-possession change.

Beyond his blandishments that I "reviewed all documents as instructed, was attentive and sober

minded, and advised me to enter the change in plea to be in compliance with the deadline to do

so" (*Affidavit* (ECF 73)), Attorney J.D. Taylor does not refute my representations that I was

unaware of that a plea agreement had been negotiated until the moment he showed up at the jail

in early February 2022.  He does not refute that at that time, I had not seen him for eight months.

He does not refute that he spent not more than 20 minutes telling me that I would be spending 24

years or more in prison if I didn't take the deal immediately. He does not refute that he told me I

had to take the deal because we were not ready for trial. He neither presented me with a copy of

the indictment nor told me that I was charged with four counts that included drug distribution.

He does not even contend that he at any time handed me a copy of the indictment.  He does not

refute my claim that he neither explained the strength of the government's case nor even showed

me the discovery.  The *Plea Agreement* nowhere mentions "drug" or "conspiracy," just a statute

number.

23.     The Government claims that I got a great deal and that I nowhere contend that I

would not have taken the plea deal had I known it was to a drug distribution conspiracy.  That is

both untrue and nonsensical.  As I state in ¶ 57 of my *Memorandum in Support* (p. 25), had he

- 9 -

told me that I was agreeing to plead guilty to a drug distribution conspiracy, "I would not have entered into the plea agreement nor pled guilty to a bogus drug conspiracy charge." The fact that I was not guilty of a drug charge and that the evidence relied on by the Government was deeply flawed makes the likelihood high that I would have gone to trial.

24.     I was guilty of the felon-in-possession charge and was willing to accept responsibility for that. My state of mind at the change-of-plea hearing was illustrated by my thinking that the indictment was the complaint, "the written charges brought against [me] by the government," as the Court put it. *Change-of-Plea Transcript* (ECF 66) entered August 23, 2022, at pp. 6-7:

> THE COURT: Now, Mr. Godsey, have you received a copy of the indictment pending against you in this case, that is, the written charges brought against you by the government?
> THE DEFENDANT: Yes, sir, 922(g).

*Id.*

25.     The Government tries to make much out of the fact that when it started talking about drugs and methamphetamine and conspiracy, I did not protest aloud. The Government is right: I did not.

26.     Instead, I did what any defendant who was frightened and confused would have done. I asked my lawyer what was going on. As I stated in my *Motion,* Attorney J.D. Taylor whispered in response that the drug conspiracy conviction didn't matter because I was already "careered out," so my sentence length. Under the pressure of the change-of-plea hearing and having no reason to disbelieve his quick and confident answer, I accepted his advice, not sure of what I was pleading to but accepting that whatever it was, it would not affect my sentencing outcome.

27.     I had no idea that Attorney J.D. Taylor's advice was deeply flawed. I faced a maximum of 10 years for a § 922(g)(1) offense, but I did not know that. Pleading to a 21 U.S.C. § 846 carried a maximum sentence of twice that.

28.     The Government argued that "[t]he record clearly establishes that Taylor reviewed both the indictment and the plea agreement with Godsey." *Government Response, supra* at p.10.  Of course, it does. Because I believed the complaint *was* the indictment, and because Attorney J.D. Taylor had kept me away from any proceeding where I would have seen or heard the indictment, I freely but mistakenly admitted that I had seen the indictment.

29.     Likewise, the Government notes that I said I was satisfied with Attorney J.D. Taylor's representation. I said so in the change-of-plea transcript on pages 8-9 at a time when I believed that the indictment was solely for a § 922(g)(1) violation. It was only a page later that I heard for the first time that I was pleading guilty to a conspiracy to possess methamphetamine. *Change of Plea* Tr. 10.  On page 12, as soon as the Government finished describing what I was really admitting to, the record shows that I conferred with Attorney J.D. Taylor.  I conferred with him again on page 13 before agreeing and again on page 14.

30.     The Government also argues that my final sentence represented a great deal for me, because the Guidelines range specified in the *PSR* maxed out at 365 months. *Response* at p. 5. The Government concludes that "it is fair to say that Godsey received a sentence of over 155 months less than what he may have received without a plea agreement." *Id.*  However, it is equally fair to say that I received a sentence of 90 months *higher* than what I could have received had I entered a guilty plea to one count of felon-in-possession under 18 U.S.C. § 922(g)(1).  The fact that it could have been worse is not a justification for it not being the bargain I reasonably believed that I had made.

31.     In my *Motion,* I explained what happened between Attorney J.D. Taylor and me at the change-of-plea hearing. It is curious that Mr. Taylor nowhere contradicts my description of our urgent and whispered conferences during the hearing. That is because he knows what happened. I responded to the government's description of a drug conspiracy with shock and dismay. Attorney J.D. Taylor quickly and incorrectly assured me that my sentence would not be any worse for it. He was wrong.

32.     Attorney J.D. Taylor's failure to refute any of these specific allegations of fact I made in my *Motion,* instead hiding behind assertions such as "my diligence used for every single client does not vary no matter the situation" (*Affidavit* (ECF 73 at p. 2)), does nothing to advance the Government's opposition to my *Motion* as much as to make my allegations all the more substantial.

> **Ground 3:     Defense counsel rendered ineffective assistance
> prior to and during sentencing**

33.     I stated in my *Motion* that I wanted to see the discovery, especially the video. When Attorney J.D. Taylor met me on February 9, 2022, to convince me to sign the plea agreement, he told me the Government had a video from my phone that showed me with drugs and guns. I had wanted to see the discovery, but he told me he could not show it to me because the jail lacked a DVD player. At that time, even prior to the change-of-plea hearing, I told him that it could not be me in the video, but I had no idea who it might be or where it came from. The Government defends Attorney J.D. Taylor's decision not to investigate whether the person on the Government's video was me, because the suggestion that it was Dalton Thrash "came from a Godsey family member, and not from Godsey personally." *Response* at p.14. Why that should matter is baffling.

34.     Attorney J.D. Taylor has not denied in his *Affidavit* that he never showed me the video or any other part of the discovery, as I clearly and repeatedly said in my *Motion.* Thus, he knows full well that I had no way to see that video while I was in jail.  Indeed, he was such a federal criminal law neophyte that when my sister asked him to get a set of the discovery to me in jail, he expressed surprise to her that the Government had not provided me with a copy already. *See Motion* at **Exhibit** 8, p.1.[4]

35.     Even before my change of plea, I provided information to Attorney J.D. Taylor that the person in the video was not me. As I showed in my *Motion,* my sister Natalie relayed to Attorney J.D. Taylor who the person actually was, that the person admitting that it was he and that he had sent a copy to me after I was jailed (and had no access to my phone). *Motion,* **Exhibit 5.** Natalie told Attorney J.D. Taylor repeatedly that I wanted to challenge the videos, specifically that the videos did not show me and did not originate with my phone. *See* **Exhibit 8**, pp. 4, 6-11.

36.     The Government argues that "it was not unreasonable to not investigate an individual whose name was first brought up near the end of Godsey's case, and who apparently was not mentioned by Godsey personally during the course of Taylor's representation." *Id.* at p.15.  This is baseless. It is unreasonable not to investigate evidence that is material to guilt or the sentence until the evidence is established or found to be baseless or impossible to prove.

37.     The Government and Attorney J.D. Taylor are correct that I had not mentioned someone on a video I had never seen. I had only known Thrash for a few weeks prior to my arrest. He had posted that video on my Facebook page to brag about what a successful meth

---

[4]     Attorney J.D. Taylor likewise thought the government was responsible for providing me with a copy of the *Presentence Report.  Motion,* **Exhibit 8**, p.4.

dealer he was. But that is not significant. It should be enough that a video so material to proving a conspiracy and setting the penalty should have been flagged by a defendant to his lawyer as depicting someone other than himself. The fact that the video did not show the face of the actor made my denial that I was the one depicted in the video more credible. When my sister got involved, she was able to tell Attorney J.D. Taylor that the person in the video was Thrash and identify someone else who had gotten the video delivered to her phone from that person. By that point, Attorney J.D. Taylor had everything he needed to have the voice analyzed, compare the tattoos on the hands in the video to mine, or even to simply find Thrash and interview him.

38.     As I noted, Attorney J.D. did not show me the video evidence the government had extracted from my cellphone prior to the plea. When I finally saw what the government was asserting was me with drugs and guns, my sister and I made it very clear to Attorney J.D. that the person in the video did not show me nor was it original to my phone. I had only known Thrash for a few weeks prior to my arrest. He had posted that video on my Facebook page to brag about what a successful meth dealer he was.

39.     My sister even located Dalton Thrash, who states in a declaration (**Exhibit 13**) that he is the person depicted in the video. After my sister talked to Thrash, she reported all of this to Attorney J.D., even adding information from another person, Gabrielle, who had gotten the same video from Dalton during the same period. Natalie repeatedly (not just "near the end" of Godsey's case) told Attorney J.D. that I wanted to challenge the notion that the videos depicted me and had originated with my phone.

40.     Under *Strickland v. Washington*, 466 U.S. 668 (1984), strategic choices made by defense counsel after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations

on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Id.* at 466 U.S. 694.

41.     I have shown what proper investigation would have revealed: a video the Government parsed into three parts to show my involvement with drugs and guns did not show me at all. That would have dramatically altered my sentence and is likely to have caused Attorney J.D. Taylor not to try to get me to admit to a bogus drug conspiracy. I was a drug user, but not a drug dealer. *See United States v. Bernard*, 762 F.3d 467, 468 (5th Cir. 2014), *citing Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010) (petitioner's showing for failure to investigate claim).

42.     But that wasn't all I provided Attorney J.D. Taylor. I wanted to challenge the idea (set out in the PSR) that I had ever been in Mexico. I relayed to Attorney J.D. that I had no passport, something that my mother could have confirmed (and does confirm in a declaration attached to my *Motion* as Exhibit 14). My mother tracks me on a GPS application she has on her phone, and she could have told Attorney J.D. that I had not been there. *Id.* While I had traveled to within 25 miles of the Mexican border on regular occasions, it was to see my son and his mother (whose existence was confirmed in the *PSR*). His mother, Veronica Mendoza, confirmed I never entered Mexico while I was with her or visiting her. *Id.*

43.     Attorney J.D. Taylor did not investigate any of the information we gave him–that the videos did not depict me, that I had never been to Mexico nor could I have been there, that my trips to near the border were to see my son–but he told Natalie on the day of sentencing that he would not argue on my behalf, because to do so "would piss the judge off".  Now his explanation is that I never told him the man in the video was Dalton Thrash (despite the fact that Attorney J.D. Taylor knew I had not been able to see the video), that my family sent him a lot of messages, and that many of those came outside business hours. Those reasons for not

investigating the video and other claims are nonsense. Beyond that, Natalie has provided a declaration that the reasons he gave for not investigating had nothing. Rather than arguing that he would not investigate because I had not mentioned Thrash to him or because it came too close to the end of the case, Attorney J.D. Taylor told her that "the video has no bearing and is not adding any additional time to Nicholas' sentencing so we should not worry about it." He also claimed that if I did not take responsibility for the video, "they were going to throw the book at [me]."[5]

44.     In his *Affidavit,* Attorney J.D. Taylor argues that "the assertion he was the one in the video and wanted to take the blame for the content, did not materialize in any way nor did the individual need myself to make such an admission." *Id.* at p.4. The suggestion here is that Mr. Thrash did not need Attorney Taylor's help to "make such an admission." That turns matters on their heads: Attorney Taylor's duty was not to Mr. Thrash, but to me. Mr. Thrash did not need Attorney Taylor. I did. I needed him to discredit a video that had nothing to do with me. How he did that–by coaxing an admission from Mr. Thrash, by physical or technical evidence, or even by third-party testimony with Mr. Thrash absent–was unimportant. What was important was that he

---

[5]     The Government parrots Attorney J.D. Taylor's defense that he had no reason to look into the video allegation because I had not identified Dalton Thrash as the person in the video. *Response* at p.15. The Government cites *Spicer v. Cain*, Case No. 18-60791 (5h Cir. 2021), 2021 U.S. App. LEXIS 29421 at *19 (no prejudice for failure to investigate where the evidence pointing to defendant's guilt is overwhelming). That, however, begs the question. The government–which never argues that the man in the video is *not* Dalton Thrash–had nothing connecting me to large quantities of methamphetamine other than the video. It had no evidence that I was ever in Mexico other than portions of the video. If–as the evidence now clearly shows–the man in the video was not me, 80% of the methamphetamine attributed to me goes away, gun dealing goes away, and my wandering around Mexico buying methamphetamine goes away.

The need to investigate the video could hardly be clearer and the effect of showing that it had nothing to do with me hardly starker.

investigate the question until a reasonable lawyer would conclude that it needed to be investigated no more.  He chose not to do that because he thought that all that methamphetamine, the trips to Mexico, and everything else did not matter because I was a "career criminal."

45.     The government argues that "complaints of uncalled witnesses are not favored in federal habeas review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Response* at p.14, citing *Day v. Quarterman,* 566 F.3d 527, 538 (5th Cir. 2009). The Government has it wrong.

46.     My complaint is not that Attorney J.D. Taylor failed to call Mr. Thrash as a witness, but rather that by refusing to investigate the video, he let the Government perpetuate the fiction that I was the one fingering the bags of meth, commenting on purity, buying drugs in Mexico and trading guns. While having Mr. Thrash testify to being the one on the screen, Attorney J.D. Taylor could have met his burden.  But he could have also shown through metadata that the video did not come from my phone, established that other people had received the same video, proven that the hands and the voice in the video did not belong to me. The Government had no evidence other than the fact the video was found on my phone that I had anything to do with the video.  Even now, the Government does not urge that I am the actor. Attorney Taylor even could have introduced an affidavit from Mr. Thrash as an admission against interest.

47.     The *Day* decision holds that to prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular

defense." *Id.* at 566 F.3d 538. Even if my claim were that counsel failed to call a witness, I would have met the test.

48.     My claim, however, is much simpler. Any competent attorney would have investigated whether the video was a depiction of me after I complained that it was not, there was no internal evidence to the contrary, and my sister identified the person in the video and showed that one other person had received the video from that person. Not only did Attorney J.D. Taylor not bother to do so, but his reasons for not investigating to this day wander all over the map.

49.     The most believable reason Attorney J.D. Taylor has advanced is legally incorrect. As a career offender, my Guidelines Adjusted Offense Level was 32, reduced to 29 with a 3-level acceptance of responsibility. But because of all of Mr. Thrash's meth (and with the erroneous Mexico connection), the *PSR* set my base offense level at 34 with a 2-level enhancement for importation. Without the Thrash meth and without the faulty conclusion that I was importing meth, my base offense level would not have exceeded 32 (with 2 for the weapon). With acceptance of responsibility, I would have a Total Offense Level of 31, not 35. While this still would have exceeded the career offender Total Offense Level of 29, my sentencing range would have been much less than it was.

50.     In most cases, "a defendant who has shown that the district court mistakenly deemed applicable an incorrect, higher Guidelines range has demonstrated a reasonable probability of a different outcome. *Molina-Martinez v. United States*, 578 U.S. 189, 200 (2016); accord, *United States v. De Leon-Sanchez*, Case No. 21-40303(5th Cir. June 8, 2022), 2022 U.S. App. LEXIS 15791, at *6. That being the case, Attorney J.D.'s failure to investigate meritorious arguments that the amount of methamphetamine attributed to me was fatally flawed and grossly

overstated constituted ineffective assistance. Had he not failed to investigate, there is a reasonable probability that my Guidelines sentencing range would have been lower.

***Conclusion***

51.     Attorney J.D. Taylor was hired early but engaged late, only in time to mislead me into a guilty plea for an offense I did not commit and lay down for sentencing rather than investigate issues that were clearly relevant and easily pursued. But for his errors, it is reasonably probable that my sentence would have been substantially shorter.

WHEREFORE, this matter should be set for an evidentiary hearing, and thereafter my *Motion* should be granted. The statements of fact made herein are true, under penalty of perjury.

Executed May 30, 2024

Nicholas Godsey
Reg. No. 08725-003
FCI Forrest City Low
P.O. Box 9000
Forrest City, AR 72336

CERTIFICATE OF SERVICE

I herewith certify pursuant to 28 U.S.C. § 1746 that I have transmitted a manually-signed original of the foregoing *Reply* by causing the same to be sent through first-class mail, postage prepaid, addressed to the following:

> Clerk of Court
> United States District Court for the
>     Southern District of Mississippi
> 501 E. Court Street
> Suite 2.500
> Jackson, MS 39201

and I have served a true and complete copy of the same by depositing said document by first-class mail, postage prepaid, addressed to the following:

> Stan B. Harris, Attorney
> U.S. Attorney's Office - Gulfport
> 1575 20th Avenue
> Gulfport, MS 39501

The foregoing statements are true under penalty of perjury.

May 31, 2024

Nicholas Godsey